UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICK BUCCIARELLI and RICK
BUCCIARELLI & ASSOCIATES, INC.,

    Plaintiffs,

v.

NATIONWIDE MUTUAL INSURANCE
CO.,

    Defendant.
                                      /

Case No. 08-cv-14349

HONORABLE STEPHEN J. MURPHY, III

**ORDER GRANTING NATIONWIDE'S MOTION
FOR SUMMARY JUDGMENT** (docket no. 70)

    Rick Bucciarelli became an agent of Nationwide Mutual Insurance Co. ("Nationwide") in 1997, with the goal of forming his own insurance agency. He developed a viable business in Northville, Michigan, with the assistance of Nationwide's agency-development program. In 2003, he took out a loan from Nationwide with the goal of adding staff and starting a satellite office. The expansion was not successful, and Bucciarelli resigned, citing frustration with Nationwide's business practices. He filed this suit to recoup losses suffered as a result of the deal's failure, accusing Nationwide of committing fraud in the inducement, breaching its contract with him, and violating Michigan's Franchise Investment Law. Nationwide brought a counterclaim to obtain a judgment on the outstanding balance of their loan to Bucciarelli.

    Nationwide moved for summary judgment pursuant to Civil Rule 56 on all of Bucciarelli's claims. The Court held a hearing on the motion on May 31, 2011. None of Bucciarelli's theories of relief present a triable claim of relief, and the Court will accordingly grant the motion for summary judgment. Nationwide's counterclaim against Bucciarelli is now the only remaining dispute in this case.

## STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over material facts is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To show that a fact is, or is not, genuinely disputed, both parties are required to either "cite[ ] to particular parts of materials in the record" or "show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The Court must take care, in evaluating the motion, not to make judgments on the quality of the evidence, because the purpose of summary judgment is to determine whether a triable claim exists. *Doe v. Metro. Nashville Public Schools*, 133 F.3d 384, 387 (6th Cir. 1998) ("[W]eigh[ing] the evidence . . . is never appropriate at the summary judgment stage.").

## BACKGROUND

Rick Bucciarelli became a Financed Career Agent ("FCA") with Nationwide in 1997. The FCA program is designed to incubate new insurance agencies by assuming some of the costs and risks of starting a new business. Def.'s Mot. S.J. 3, ¶ 6, March 1, 2011, ECF No. 70. In exchange for an annual salary of $65,000 from Nationwide, plus commissions and business expenses, Bucciarelli began running an insurance agency selling Nationwide insurance products in Northville, Michigan. *Id.* at ¶ 7. He succeeded in creating a viable agency. After achieving sustainability, he entered an Independent Contractor Agent's

2

("ICA") Agreement with Nationwide in May 2003. *Id.* at ¶ 9. As an ICA, Bucciarelli had complete authority over the operation of his agency, subject to Nationwide's control over insurance rate-setting and underwriting. *Id.* at 4, ¶ 12. He was paid by commissions generated from sales, handled all agency expenses, and made the agency's employment decisions. *Id.* at ¶ 13. In both his ICA and FCA contracts, Bucciarelli agreed to language providing Nationwide with

> the right to change, alter, or amend [the] rules, regulations, prices, and terms [by which it insures risks], including the right to establish quotas and to limit, restrict, or discontinue entirely the acceptance or writing of any policies, coverages, lines or kinds of insurance, at any time it deems it advisable to do so, and without notice to or consent of Agent, and any such change, alteration, amendment or limitation shall become effective on the date specified by the Company.

FCA Agreement ¶ 14, Apr. 28, 1997, ECF No. 70-3; ICA Agreement ¶ 15, June 1, 2002, ECF No. 70-4. This authority was often a source of frustration for Bucciarelli. Beginning in 2002, he complained about Nationwide's rate-setting, underwriting policies, and communication with agents. Bucciarelli Dep. 41–43. These problems worsened over time. *Id.* at 44.

In 2003, Bucciarelli began efforts to expand his agency by opening a new office. Nationwide had a corporate goal of becoming the nation's "number three" insurance carrier by 2009, and was making an aggressive push for growth. By Bucciarelli's admission, the company did not issue an "ultimatum" about growth, but there were suggestions that certain agency benefits, like marketing dollars and merged books, would only be provided to agencies seeking to expand their business. Bucciarelli Dep. 175. He also heard "rumblings" from other agents serving on advisory boards that Nationwide was looking to eliminate "smaller agents." *Id.* at 176.

Bucciarelli applied for a loan through Nationwide's Capital Access Program ("CAP"). Def.'s Mot. S.J. at 5, ¶ 20. The loan would provide funding Bucciarelli needed to hire more

staff and open a satellite office in Westland, Michigan. In conjunction with Nationwide, Bucciarelli prepared a loan application, also known as a pro forma, which detailed the history of Bucciarelli's agency, outlined his goals, and set performance benchmarks. *Id.* at ¶ 23. These benchmarks incorporated numerous predictions about earnings and expenses in the first few years of the loan based on figures provided by Nationwide. *Id.* at ¶ 24. Nationwide was enthusiastic about the potential expansion, and told Bucciarelli that he would be competitive in the Westland market. *Id.* at 87. Nonetheless, Bucciarelli admits that estimates of growth in the Michigan's economy and his agency were just that — estimates that might not reflect what would happen in the future. *Id.* at 76–78, 83. Bucciarelli understood that these projections were, in his words, "only as good as the consultant that [Nationwide] hired," but conceded that he trusted Nationwide's analysis of the data. He viewed their relationship as a "partnership," and assumed that they would not invest in a further expansion of his business without due diligence. *Id.* at 85–94. He admits that he did not seek a second opinion on the estimates, and did not ask Nationwide for additional data that would assist in evaluating the estimates. *Id.*

On November 18, 2003, Nationwide Bank, Nationwide's lending arm, approved a $100,000 CAP loan for Bucciarelli. Attached to the loan was a Performance Agreement with several features that are crucial to this motion. First Nationwide agreed to pay the interest on Bucciarelli's loan during an initial three-year "Performance Period." Performance Agreement ¶ 3(B), Nov. 18, 2003, ECF No. 70-7. Second, the agreement limited Bucciarelli to an initial $70,000 disbursement, with the additional $30,000 only becoming available if a certain amount of insurance was written. *Id.* at ¶ 3(A). Third, the loan provided for the possibility of waiver if certain performance targets were reached. *Id.*

4

at ¶ 4. Bucciarelli separately initialed these waiver provisions on the contract, signaling acceptance of the performance targets contained in the waiver clause.

Bucciarelli hired some new staff with the loan proceeds, and opened his satellite office in Westland in 2005. The results were disappointing. Bucciarelli's profits dropped off sharply after the expansion. Low employee retention, high overhead, increased insurance rates in Michigan, and the overall slump in the economy all worked together to undermine the venture's success. Def.'s Mot. S.J. at 6, ¶ 34. Consequently, Bucciarelli failed to meet the production targets for waiver of the loan. *Id.* ¶35. He resigned as a Nationwide agent in 2008, and filed this lawsuit in the same year to recover his losses as a result of the failed expansion.

**DISCUSSION**

I.   Fraud in the Inducement

The bulk of Bucciarelli's brief is spent discussing the "fraud in the inducement" count in his complaint. Under Michigan law, fraud requires proof that the defendant knowingly or recklessly made a false representation with the intent that the plaintiff would rely on that misrepresentation, causing actual reliance and an injury. *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336 (1976). Fraud in the inducement is a sub-theory of fraud that occurs when the defendant "materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Samuel D. Begola Servs. Inc. v. Wild Bros.*, 210 Mich. App. 636, 639 (1995). Bucciarelli claims that Nationwide's misrepresentations induced him into agreeing to the CAP loan, and that in the absence of such misrepresentations, he would have never entered the bargain.

5

Bucciarelli complains of at least five different material misrepresentations on the part of Nationwide: (1) overly optimistic projections about Bucciarelli's business in the pro forma agreement he drafted with Nationwide; (2) statements in an e-mail describing a new program for setting rates in glowing terms that did not have the impact Nationwide hoped it would have; (3) Nationwide's inability to provide competitive rates for the Westland office when it initially opened; (4) failure to disclose information about alternate competition from Nationwide directly and from a wholly-owned subsidiary; and (5) failure to disclose purported information about the unrealistic nature of the loan waiver program. Based on the material and undisputed facts in the record, these claims do not hold up.

Before considering the merits of these claims, a preliminary observation is in order. Michigan courts consider fraud in the inducement a defense to contract formation. *City of Flint v. OK Indus., Inc.*, 2007 WL 1061908, at *1 (Mich. Ct. App. Apr. 10, 2007). If successfully proven, it gives the defrauded party an opportunity to void the agreement. *Samuel D. Begola Servs.,* 210 Mich. App. at 640. But it is thought of as an offensive theory that entitles the defrauded party to damages. *Spooner Const., Inc. v. Jackson*, 2008 WL 142420, at *4 (Mich. Ct. App. Jan. 15, 2008); *see also Evens-McCarthy v. Nationwide Mut. Ins. Co.*, No. 08-cv-12049, 2008 U.S. Dist. LEXIS 83702, at *6–9 (E.D. Mich. July 24, 2008) (summarizing Michigan case law on this point). Unfortunately, Bucciarelli's complaint does not seek mere recision of the contract, but "damages in an amount to exceed $75,000." Compl. ¶ 40. Therefore, even if one of these claims were to survive, it is doubtful that the Court could award Bucciarelli the relief he seeks because he received money from Nationwide and has not expended any that would constitute damages on the contract. Nonetheless, because this issue is likely to arise again when Nationwide seeks a judgment on its note, the Court will consider the merits of the claims as briefed by the parties.

A. <u>A "Partnership"?</u>

In his motion response, Bucciarelli attempts to classify the relationship he had with Nationwide prior to the 2003 loan agreement as a "partnership," in which Nationwide owed him a higher duty of disclosure than it would have otherwise. In an informal sense, Bucciarelli and Nationwide are "partners" in that they "associated . . . in action" with each other. Webster's Third New International Dictionary 1648 (1961). But not all "partners" form a "partnership" in the legal sense of being "co-owners [of] a business for profit." Mich. Comp. Laws § 449.6(1); *see also id.* § 449.7 (listing factors courts may consider in determining whether a group has entered a partnership). Bucciarelli was a Nationwide employee when he started his agency, and an independent contractor when he graduated past the start-up stage. These relationships are governed by contracts, not partnership law. Bucciarelli cites to *Garlick v. Lake Shore Lumber Co.*, 220 Mich. 179 (1922), for the notion that "special relationships" require "full disclosure" between parties. But that case addressed defendants who took advantage of an unknowing plaintiff with whom they had formed a corporation, where there was undoubtedly a special legal relationship requiring heightened duties of disclosure. *Garlick*, 220 Mich. at 181–82. The Court will not confuse this case with a dispute arising under the law of partnerships..

B. <u>Alleged Fraudulent Statements</u>

1. <u>Pro Forma Projections</u>

Bucciarelli attacks the accuracy of the pro forma prepared in anticipation of the loan. He concedes that the it was a projection based on estimates about economic conditions that were subject to change. It was *not* a promise of future actions to be taken by Nationwide. The prognostications in the pro forma therefore appear to be beyond the reach of a fraudulent inducement claim. *Custom Data Solutions, Inc. v. Preferred Capital, Inc.*,

7

274 Mich. App. 239, 242 (2006); s*ee also Evens-McCarthy*, 2008 U.S. Dist. LEXIS 83702, at *6 (finding, in a case where a Nationwide operating under the same agreement as Bucciarelli entered a loan agreement that did not live up to expectations, that no fraudulent inducement claim existed because "[p]laintiff does not allege that defendant misrepresented its future conduct, but rather that defendant misrepresented, in essence, the likely success of plaintiff's agency"). Bucciarelli admits that he relied on these projections without seeking a second opinion as to their accuracy, and entered the agreement anyway. While it is true that some Nationwide employees, when deposed, expressed the opinion that some of the cashflow predictions in the pro forma were unduly optimistic, that does not transform projections into false statement about Nationwide's future actions. Bucciarelli's accusations do not create a triable claim for fraud in the inducement.

2. <u>Class Plan M</u>

The next contention made by Bucciarelli is that Nationwide's premature enthusiasm about "Class Plan M," which was described in a 2004 e-mail to Bucciarelli as an opportunity to grow Nationwide's auto insurance business by offering more competitive rates, induced him to expand his business under false pretenses. *See* E-mail from Joe Young, Mar. 16, 2004, ECF No. 71-4. In practice, Bucciarelli claims, the system only made Nationwide's rate-setting problems worse. But the e-mail constitutes nothing more than optimism about the program's potential success, which, as a matter of law, cannot satisfy a fraudulent inducement claim. *Van Tassel v. McDonald's Corp.*, 159 Mich. App. 745, 750 (1987) ("An action for fraud may not be predicated upon the expression of an opinion or salesmen's talk in promoting a sale, referred to as puffing."). Moreover, since the claims in the e-mail were made in 2004, the Court does not see how they could have induced Bucciarelli to enter a

8

loan agreement made *one year prior* to the e-mail being sent. The e-mail does not support a claim of fraud in the inducement.

### 3. Promises to Offer Competitive Rates

Bucciarelli's claims about the rates Nationwide would offer on loans are also insufficient to create a triable issue of fraud in the inducement. He asserts that Nationwide assured him it was dedicated to making his new venture a success. From these statements, he drew an inference that Nationwide would provide him with competitive product rates, because of a well-understood relationship in the insurance industry between rates and agency success. Bucciarelli Dep. 191–92. But no one claims that Nationwide explicitly promised to give Bucciarelli more aggressive rates to give his venture a head start. Indeed, the pro forma projections he developed alongside Nationwide contemplated significant rate *increases* over the initial expansion period. Copy of Pro Forma 17, April 16, 2009, ECF No. 71-17. Moreover, under contractual language Bucciarelli signed not once, but twice, during his tenure with Nationwide, the company had broad rights to alter its rates, and even withdraw from doing business in Michigan, at its discretion, and without notice.

*In re Allied Supermarkets, Inc.*, 951 F.2d 718 (6th Cir. 1991) does not compel a different conclusion. In that case, the defendant grocery store made actual misrepresentations of fact about expenses in gross profits it gave to agents operating its grocery stores, and actively discouraged its agents from checking the gross profit numbers for themselves. *Allied Supermarkets*, 951 F.2d at 721–22. But the case before the Court does not present such an issue. Both sides in this case knew that insurance rates were subject to change and that, try as Nationwide might, rates would sometimes be higher than an agent would like. Moreover, both sides actively anticipated a period of steady rate increases. Bucciarelli's claim rests on assumptions about what Nationwide needed to do

9

to make him competitive, and not on any explicit promise from Nationwide that it would do certain things to ensure his competitiveness. Nationwide is therefore entitled to summary judgment on this theory of relief.

### C. "Silent Fraud" Theories

#### 1. Alternate Competition

The second thread of Bucciarelli's argument attempts to cast certain business moves made by Nationwide as a form of "silent fraud." Silent fraud exists when a defendant "suppresses material facts and there is a legal or equitable duty of disclosure." *M & D, Inc. v. W.B. McConkey*, 231 Mich. App. 22, 36 (1998). According to Bucciarelli's theory of the case, Nationwide undercut its agents ability to successfully compete in an effort to pursue growth, without letting the agents know about these changes. This was allegedly done in two primary ways: through increased direct sales of insurance by the company, and by using Allied, a wholly-owned subsidiary of Nationwide, as a "discount" broker of insurance service that undercut Nationwide agents on price.

Neither action by Nationwide creates a cause of action for "silent fraud." Allied has been a wholly-owned subsidiary of Nationwide since 1998, and Nationwide's competition between its own agents and agents of its subsidiary ought not to come as a surprise. Def.'s Rep. 7, Apr. 7, 2011, ECF No. 75. Nationwide never hid this from Bucciarelli, or from anyone else. Bucciarelli made no attempt to inquire when he entered the loan agreement about potential alternative outlets of competition. The direct sales program is even less relevant, as Nationwide did not begin this program until 2008 — five years *after* Nationwide approved the CAP loan. Because Bucciarelli has not demonstrated Nationwide had a duty to disclose these aspects of its business, or that it failed to disclose them, the claim fails.

Bucciarelli makes an effort to analogize Nationwide's usage of competing sales forces to *Little Caesar Enterprises, Inc. v. OPPCO, LLC*, 219 F.3d 547 (6th Cir. 2000), but that case is not on point. In *Little Caesar*, the defendant was a franchising company that bought into Little Caesar franchises in South Dakota. *Little Caesar*, 219 F.3d at 549. In addition to franchises, Little Caesar operated several company-owned restaurants inside of K-Marts in the area where the defendant hoped to open franchises. *Id.* The real-estate manager for Little Caesar told the defendant's representatives that the restaurants inside K-Marts did not compete for business with the franchises. *Id.* In reality, the outlets in the K-Marts did compete with the franchises. *Id.* at 550. The Sixth Circuit found that this satisfied the elements of fraudulent inducement. *Id.* at 551–52. *Little Caesar* is not applicable to the facts of this case. It involved very explicit fraudulent statements, not silent fraud, that went directly to the company's desire to engage in direct competition with franchisees. Nationwide never claimed that Allied agents would not be in competition with Bucciarelli, nor did it promise to refrain from a foray into the direct sales business. Accordingly, the claim fails.

    2. <u>"Silent Fraud" Regarding Agents Achieving Loan Waiver</u>

Bucciarelli makes another accusation of silent fraud with respect to the prospects of attaining loan waiver. He claims that he was never apprised that the rates of loan waiver were dropping dramatically, and that certain officials in Nationwide disagreed with the loan waiver program, calling it "unrealistic."

The charges fail for three reasons. First, Bucciarelli's assertions about the waiver rate are based on a misinterpretation of Nationwide's data. Bucciarelli attached to his motion a chart showing statistics on the rate at which CAP loan participants achieved waiver or partial waiver. CAP Loan Statistics, ECF No. 71-5. While it is true that there are

dramatically fewer loans achieving "full waiver" in the later years of the program, this is not because of a falloff in the program's success. What it actually reflects is the number of loans that were still "active," i.e., that had yet to reach the deadline for achieving loan waiver benchmarks.[1] When only the "completed" loans are taken into account, over 42 percent of CAP loan recipients achieved complete or partial loan waiver. Nationwide could not conceal the fact that the waiver deal was an unrealistic promise because it was never a "fact" to begin with.

Second, there is no evidence that Nationwide attempted to conceal information about the odds of achieving waiver. As suggested earlier, Bucciarelli uncritically accepted Nationwide's analysis of how realistic fulfillment of the loan would be, and did not ask for additional data that would aid his decision, such as waiver rates. *Webb v. First of Mich. Corp.*, 195 Mich. App. 470, 474 (1992) ("[T]here can be no fraud where the means of knowledge regarding the representation are available to the plaintiff and the degree of their utilization has not been prohibited by the defendant.").

Third, even if was true that waiver was not an achievable outcome, that fact is not relevant to a breach of contract dispute where no active concealment has been established. Bucciarelli entered an arm's length contract in which he agreed what the conditions were for waiver, and the agreement was completely integrated. Expressions about the plausibility of waiver, or the coherence of the performance requirements, cannot excuse Bucciarelli from the bargain he struck. *See Stopczynski v. Ford Motor Co.*, 200 Mich. App.

---

[1] For instance, in 2002 and 2003, 45.9% and 32.7% of the CAP loans achieved full or partial waiver, respectively. At the time the chart was made, these were the only periods where none of the loans issued were active. By contrast, in 2004 and 2005, only 17.3% and 4.8% of the loans were given some form of waiver, but those were periods in which 23.9% and 62.9% of the loans remained active. While waiver rates may have been on the decline, for any number of reasons, the data does not support the notion that waiver had become virtually impossible.

190, 193 (1993) ("[O]ne who signs a contract cannot seek to avoid it on the bases that he did not read it or that he supposed that it was different in its terms."). Therefore, this claim of fraud in the inducement is not meritorious.

II. Breach of Contract Claims

Bucciarelli argues that there Nationwide engaged in"numerous" breaches of its contract with him, but he limits his arguments to three actions it took. Under a choice-of-law clause in the contract which Bucciarelli has not challenged, this aspect of the motion is governed by Ohio law. None of these assertions Bucciarelli makes create an issue for the jury, and the Court will therefore dismiss the breach of contract claim.

Promissory notes, such as the one signed in this case, are unilateral contracts under Ohio law. As such, the agreement did not impose any obligations on Nationwide. *Resolution Trust Corp. v. J.B. Centron Dev. Co.*, 92 Ohio App. 3d 643, 648 (1993). Moreover, under the Ohio Revised Code, which incorporates Article 3 of the Uniform Commercial Code ("UCC"), promissory notes are generally treated as negotiable instruments. *Midland Title Security, Inc. v. Carlson*, 171 Ohio App. 3d 678, 684 (2007). As the maker of the note — i.e., the person obliged to pay the amount provided on the note — Bucciarelli is not a party with rights to enforce obligations under the note, as contemplated by the UCC. *See* Ohio Rev. Code Ann. § 130.31(A) (listing the parties with rights to enforce the note). Therefore, Bucciarelli lacks standing to enforce the provisions in the contract he claims Nationwide breached.

Even if he had standing, Bucciarelli's arguments lack freestanding legal merit anyway. First, he argues that because he was not in default when Nationwide declared his loan uncollectible and accelerated his obligations, Nationwide breached the contract. This point is not relevant to the issues here. The credit agreement Bucciarelli and Nationwide entered

13

provides that "the date on which this Loan matures may be accelerated if [Bucciarelli] does not continue to participate in the Agent Program to which this Loan is related." Credit Agreement and Promissory Note at 000126, Nov. 19, 2003, ECF No. 70-6. When Bucciarelli ended his participation in the Nationwide program, Nationwide had a right to call their loan.

Second, Bucciarelli criticizes a 6% service fee Nationwide added to his loan payoff that he believes cannot be explained. But Nationwide only added the fee in lieu of continuing to compound interest on the loan, which actually served to *mitigate* Bucciarelli's potential liability. Nationwide had the right to collect more interest on the loan than it actually chose to, so even if the action formally constituted a breach of contract, it could not have created a legally-cognizable harm. Credit Agreement & Promissory Note 1, Nov. 19, 2003, ECF No. 70-6.

Third, Bucciarelli insists that Nationwide should have applied extended earnings it owed him to pay off the balance of the loan immediately. As a result of his work for Nationwide, Bucciarelli was entitled to graduated payments for work he performed once he resigned. More specifically, he was owed $7,334.60 per month in the first year after his departure, and lump-sum payments of $80,007.13 the next two years. Bucciarelli Election Form, Apr. 17, 2008, ECF No. 70-13. The reason Nationwide did not apply those payments immediately to Bucciarelli's loan is that the payments were not yet owed to him. The contract language providing that amounts Nationwide owed to Bucciarelli should be applied to satisfy loan obligations in the first instance cannot be read to implicitly accelerate obligations that had yet to take place. Accordingly, this argument is also meritless, and the breach of contract claim fails.

III. <u>Michigan Franchise Investment Law</u>

Bucciarelli did not respond to Nationwide's arguments regarding the applicability of the MFIL, Mich. Comp. Laws § 445.1501–46, to this case. The Court need not address all of Nationwide's arguments in detail, but will highlight its most persuasive points. First, there is no intent in either of Bucciarelli's employment agreements with Nationwide to form a franchise. The word "franchise" is not used in either document. *Jerome-Duncan Inc. v. Auto-By-Tel, L.L.C.*, 989 F. Supp. 838, 842 (E.D. Mich. 1997) ("While not dispositive, [the absence of the word 'franchise'] is clearly probative of what type of agreement was reached."). Moreover, insurance law is heavily regulated in Michigan by a completely separate body of law, and it seems unlikely that the parties would intend their relationship to be governed by state franchise law rather than insurance law. *See* Def.'s Rep. 15 n.15 (summarizing cases from outside jurisdictions that conclude state insurance law governs the relationships between insurers and agents, to the exclusion of franchise law). Second, Bucciarelli produces no evidence that he paid a "franchise fee" to Nationwide to establish his "right to enter into a business under a franchise agreement." Mich. Comp. Laws § 445.1503(1). The fee is required by law in order to make the provisions of the MFIL applicable to a particular relationship. *Id.* § 445.102(3)(c) (listing the elements of a "franchise" under the MFIL). Third, this Court has rejected attempts to apply the MFIL in similar circumstances on at least four other occasions. *See* Def.'s Rep. 14–15 (summarizing cases). The Court concludes that summary judgment for Nationwide on this final claim is also appropriate.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that Nationwide's motion for summary judgment (docket no. 70) is **GRANTED**.

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: June 30, 2011

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 30, 2011, by electronic and/or ordinary mail.

Carol Cohron
Case Manager